In the Matter of the Estate of SAM LEIKIND, Deceased. HARRY LEIKIND, as Administrator of the Estate of SAM LEIKIND, Deceased, Appellant; ATTORNEY-GENERAL OF THE STATE OF NEW YORK et al., Respondents.

Christ, Acting P. J., Rabin, Munder and Nolan, JJ., concur; Benjamin, J., dissents and votes to affirm the decree, with the following memorandum: The issue here is whether the Surrogate's Court is powerless to deal with appellant's attempt to circumvent our law and public policy by a devious stratagem. The issue stems from the following facts: One of the distributees of the estate of Sam Leikind, deceased, was Dvaireh Kaminsky, a resident of the U. S. S. R. The administrator of the estate was Harry Laikind, Dvaireh's brother. On the settlement of Harry's accounts in 1961, the Surrogate decreed that Dvaireh's distributive share ($6,397.03) be deposited with the City Treasurer to Dvaireh's credit, subject to further order of the Surrogate. The deposit was directed pursuant to section 269-a of the Surrogate's Court Act, which provides for such deposit where it appears that the distributee would not have the benefit or use of the money due him. Section 269-a further provides that the deposit shall be for the benefit of the distributee "or such person or persons who may thereafter appear to be entitled thereto"; and that the money so deposited shall be paid out only by special order of the Surrogate or pursuant to the judgment of a court of competent jurisdiction. As is well known, the intent of this statute was to preserve and keep safely moneys payable to distributees living in Communist countries, whose governments do not permit the free use and control of private funds by their citizens, so that the net effect of a payment to such distributees could be a payment to their governments. Since it is now established law that section 269-a may not be circumvented by the artifice of an assignment of the deposited fund from the foreign distributee to a New York resident (*Matter of Geiger,* 7 N Y 2d 109), Harry and Dvaireh apparently concocted a different, quite novel plan to get possession of the fund on deposit, which by then amounted to $7,283.32. Harry had Dvaireh write him a letter from the U. S. S. R. in which she said that she owed him $3,600 for moneys he had sent her over the years; that she wanted to repay him from the money left her by decedent Sam Leikind; and that he should try to get the money that she owed him from the court that had possession of her inheritance. Harry then promptly sued Dvaireh in the Supreme Court on this $3,600 "debt"; he obtained an order of attachment against the fund on deposit and served Dvaireh by publication. Dvaireh naturally defaulted, and Harry obtained a default judgment. His judgment was for $7,308, made up of a $3,603 debt, interest of $3,672 from 1947, and $33 costs; and "by coincidence", this was almost exactly the same amount as the fund on deposit, which then amounted to $7,283.32. Armed with his judgment and order of attachment, Harry then tried to obtain possession of the fund from the City Director of Finance, but that official refused to honor the Sheriff's levy unless the Surrogate ordered the turnover pursuant to section 269-a. Harry then applied to the Supreme Court (*not* the Surrogate's Court) for an order directing the Director of Finance to pay over the fund; the Supreme Court denied his application, without prejudice to an application to the Surrogate. Perforce, Harry then applied to the Surrogate for a turnover of the fund; the Surrogate denied his application on the ground that his default judgment, obtained on Dvaireh's consent, was tantamount to an assignment given with intent to circumvent section 269-a, and that such assignment or circumvention was ineffective under the holding in *Matter of Geiger* (*supra*). Harry has appealed, and the majority of this court is reversing on the grounds that (a) the denial of the application by the Surrogate was an improvident exercise of discretion because the circumstances do not indicate an intent to circumvent the statute;

(b) the Supreme Court (which granted the default judgment) had obtained jurisdiction in rem with respect to the fund by virtue of the attachment; and (c) the Supreme Court judgment is not subject to collateral attack in the Surrogate's Court. For various reasons, I am constrained to disagree with my colleagues. *First:* Subdivision 10 of section 314 of the Surrogate's Court Act, which defines "persons interested" in an estate, excludes creditors from the category of "persons interested". I see no reason why a judgment creditor is different from an ordinary creditor in this respect. When section 269-a is read with subdivision 10 of section 314, it would seem that a judgment creditor of the foreign distributee cannot be considered "a person entitled to the fund" which has been deposited in custody of the court pursuant to section 269-a. *Second:* Section 269-a authorizes a payout of the fund only on special order of the Surrogate or pursuant to the judgment of another court of competent jurisdiction. It seems plain that the judgment referred to in the statute is a judgment *directing the payout of the fund.* The default judgment obtained by Harry in the Supreme Court obviously is not such judgment; it does not direct the payout of this fund but merely grants a money judgment against Dvaireh. Indeed, the Supreme Court specifically *refused* to direct the turnover of the fund to Harry when it denied his post-judgment application for that relief, without prejudice to an application to the Surrogate's Court. With respect to the Surrogate's power to direct a turnover of the fund by special order, it is evident that this is a discretionary power. In this case, I see no improvident exercise of discretion by the Surrogate when he refused to turn over the fund to Harry. To me, as to the Surrogate, it seems crystal clear on this record that the maneuvers of Harry and Dvaireh were designed to circumvent section 269-a, and the public policy underlying it, by an artifice calculated to outflank the holding in *Matter of Geiger* (*supra*). That being so, it can hardly be said that the Surrogate's refusal to aid them in the fruition of their scheme was an improper exercise of discretion. On the contrary, I see his determination as an eminently proper exercise of discretion. *Third:* Unlike my colleagues, I view the Surrogate's determination as not being a collateral attack on the Supreme Court judgment. As pointed out, *supra,* that judgment did not direct the turnover of the fund to Harry, but merely made him a judgment creditor of Dvaireh. The Surrogate's refusal to pay out the fund to Harry was merely a discretionary determination that such payout was unwarranted under all the circumstances. That determination did not impeach the judgment, disobey the judgment, or in any way destroy the judgment's legal effect. Hence, it cannot be deemed a collateral attack on the judgment. In any event, if we were to deem it a collateral attack on the judgment, such collateral attack would seem to be proper and supportable on this record, since there is authority for the rule that a fraudulent or collusive judgment is not conclusive against a third party liable to the judgment debtor (see *Hartford Acc. & Ind. Co.* v. *First Nat. Bank,* 281 N. Y. 162; 9 Carmody-Wait 2d, § 63: 218). And at bar we have what appears to be a fraudulent and collusive judgment which is sought to be enforced against a third party (the City Director of Finance) who is holding the fund for the benefit of the judgment debtor (Dvaireh). *Fourth:* I disagree with my colleagues' conclusion that, by issuance of the attachment, the Supreme Court acquired jurisdiction in rem of the fund. In my view, the sole effect of that attachment (if, indeed, it had any effect at all) was to give Harry a right to the fund *after Dvaireh became entitled to receive it from the Director of Finance* (see: *Dunlop* v. *Patterson Fire Ins. Co.,* 74 N. Y. 145). This is so because an attachment by one court, issued against a fund in the custody of another court, affects only the residual rights of the owner

of that fund, after the court having custody of that fund "should see fit to declare the purpose fully served for which it took it into custody" (*Dunlop, supra,* p. 149). The Supreme Court attachment could not effect a present taking of the fund from the possession of the Surrogate's Court, either exclusively or in common with that court, since, as above noted, the attachment affected only Dvaireh's residual rights in the fund after she became entitled to its possession (*Dunlop, supra*). Nor could that attachment and subsequent judgment unfreeze this fund, since only a Supreme Court judgment specifically directing its turnover to appellant or a Surrogate's Court decree similarly so directing could have such effect. And, apart from the foregoing, there is some indication in *Dunlop* (*supra,* pp. 151–152) that this fund in the custody of the Surrogate's Court may perhaps have been immune from attachment by the Supreme Court because it "did not go [into the custody of the Surrogate's Court] directly from the debtor in the attachment, but from some other and original and independent source, over which the attachment debtor had no control as an owner." For all these reasons, my answer to the question posed at the outset of this memorandum is that the Surrogate's Court need not, may not, and should not aid appellant in his attempt to obtain possession of this fund. I, therefore, vote to affirm the Surrogate's decree.